IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

```
FILED

MAY - 8 2013

CLERK, U.S. DISTRICT COURT
NORFOLK, VA
```

ANGELEX LTD., as owner of the M/V ANTONIS
G. PAPPADAKIS, and the M/V ANTONIS G.
PAPPADAKIS in rem,

      Petitioners,

v.

                                      Civil No. 2:13cv237

UNITED STATES OF AMERICA,
UNITED STATES COAST GUARD, and
UNITED STATES CUSTOMS AND BORDER
PROTECTION AGENCY,

      Respondents.

## MEMORANDUM OPINION

      This matter involves an emergency petition and motion for release of the M/V Antonis G.
Pappadakis, a Greek-flagged merchant vessel that has been denied Customs departure clearance
while the Coast Guard investigates potential criminal violations of a marine pollution prevention
protocol. Notwithstanding this investigation, under the applicable statute, departure clearance may
be obtained by the vessel upon filing of a bond or other surety satisfactory to the Secretary of
Homeland Security. The Coast Guard, as delegate of the Secretary of Homeland Security, initially
demanded that the owners of the Pappadakis post a bond of $3 million and agree to certain additional
non-monetary conditions to facilitate the investigation, including paying the salaries and expenses
for seven crewmembers to remain behind in this district until criminal proceedings are completed or
Rule 15 depositions are taken. The Coast Guard subsequently lowered its demand to $2.5 million,
but the petitioners assert that they are financially unable to post more than a $1.5 million bond (or
$750,000 cash), and that the Pappadakis is thus effectively detained indefinitely as a result, and at

great expense. The petitioners further object that the additional surety conditions would subject the seven crewmembers to functional detention for an indefinite period as well.

The petitioners in this matter are Angelex Ltd., owner of the motor vessel Antonis G. Pappadakis, and the Pappadakis itself, in rem. The vessel's operator, Kassian Maritime Ltd., is not a party to this action, but it may be a defendant if criminal charges ultimately are filed. The respondents are the United States of America, the United States Coast Guard ("Coast Guard"), and the United States Customs and Border Protection Agency ("Customs"). Both Customs and the Coast Guard are components within the United States Department of Homeland Security.

## I. BACKGROUND

The underlying criminal investigation involves alleged violations of the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. §§ 1901 et seq., which implements the International Convention for the Prevention of Pollution from Ships (the "MARPOL Protocol"). See 33 U.S.C. § 1908(a) (knowingly violating the MARPOL Protocol is a Class D felony); see also 18 U.S.C. § 3571(c) (imposing a maximum fine of $500,000 per violation for an organizational defendant). Among other types of pollution, the MARPOL Protocol is intended to combat the dumping or discharge of oil and oil-contaminated bilge water into the seas. APPS, of course, is similarly intended to combat pollution from ships in the territorial waters of the United States.

Pursuant to 46 U.S.C. § 60105(b), a foreign-flagged vessel such as the Pappadakis must obtain departure clearance from Customs before it may depart a United States port for any other destination, foreign or domestic. Under APPS,

> if reasonable cause exists to believe that the ship, its owner, operator, or person in charge may be subject to a fine or civil penalty under this section, the Secretary [of Homeland Security] . . . shall refuse or revoke the clearance required by section 60105 of Title 46. Clearance may be granted upon the filing of a bond or other surety satisfactory to the Secretary.

33 U.S.C. § 1908(e).  The regulations implementing APPS further provide that "[c]learance or a permit to proceed may be granted when the [Customs] port director is informed that a bond or other security satisfactory to the Coast Guard has been filed."  19 C.F.R. § 4.66c(a).

The vessel in this case, the Pappadakis, is required under the MARPOL Protocol to maintain an oil record book in which the crew accurately records any discharge overboard or disposal otherwise of bilge water, including any accidental or emergency discharges.  See 33 C.F.R. § 151.25(d).  On April 14, 2013, the Pappadakis arrived at the Norfolk Southern Terminal to load coal for delivery to a customer in Brazil.  On April 15, 2013, when Coast Guard personnel were conducting a routine safety examination of the vessel, a member of the crew passed a note to one of the inspectors claiming that the vessel's oily water separator had been bypassed and oily bilge water had been discharged overboard, but not noted in the oil record book.[1]  The crewmember showed the inspector a camera with photos of a makeshift pump and hose, allegedly used to bypass the vessel's oily water separator and pump oily bilge water directly from the bilge tank to the marine sanitation system for discharge overboard, and he led the inspector to the pump and hoses, which were confiscated.  Upon inspection, the vessel's oily water separator was allegedly found to be inoperable, and inspectors found additional physical evidence suggesting the possible discharge of oily bilge water overboard.  Closer examination of the vessel's oil record book allegedly revealed significant discrepancies in the amounts of oily bilge mixtures produced and the amounts contained in the bilge water holding tanks, suggesting that the oil record book was incomplete or falsified.[2]  On April 19,

---

[1] Notably, APPS provides an incentive for such whistleblowing activity, providing that "[i]n the discretion of the [sentencing] Court, an amount equal to not more than ½ of such fine may be paid to the person giving information leading to the conviction."  33 U.S.C. § 1908(a).  This gives this Court some pause to consider whether unintended consequences might result from such a bounty.  But it is of no moment here in this action.

[2] The Court is compelled to note that there is no allegation in this matter, much less any evidence, of a discharge with oil content exceeding fifteen parts per million, the threshold

2013, Coast Guard officials delivered a letter to the port agent for the Pappadakis advising that Customs was withholding the vessel's departure clearance at the Coast Guard's request, pursuant to § 1908(e).

Following delivery of the letter, the Coast Guard and counsel for the petitioners began negotiations for a security agreement that would permit the Pappadakis to leave port. The Coast Guard initially demanded a $3 million bond as security for the vessel's clearance, and the petitioners counteroffered with a $500,000 cash bond. The Coast Guard subsequently reduced its bond demand to $2.5 million, and the petitioners offered to post either a $750,000 cash bond—substantially all of the owner's free cash on hand—or a $1.5 million surety bond.

In addition, the Coast Guard's proposed security agreement also sought to impose additional obligations on the petitioners, requiring that they: (1) make the Pappadakis crewmembers and other employees available for legal proceedings, including travel arrangements to facilitate court appearances and meetings with counsel or with law enforcement; (2) encourage the crewmembers to cooperate with investigators; (3) refrain from taking disciplinary or other adverse action against crewmembers who cooperate; (4) prevent certain material witnesses from leaving with the vessel; (5) take custody of these material witnesses' passports for safekeeping and notify counsel for the government if requested to return them; (6) stipulate to certain incontrovertible facts, such as ownership and operation of the vessel and authenticity of documents and other items taken from the ship; (7) authorize counsel to accept service of correspondence and legal papers; (8) enter an appearance in federal district court to answer any criminal charges that are filed; (9) assist in effecting service of process on foreign crewmembers; and (10) return crewmembers to their home countries when their presence in the United States is no longer needed for anticipated criminal

---

established by the MARPOL Protocol, nor any allegation or evidence that any such discharge occurred within this judicial district.

proceedings. These measures are all purportedly intended to substitute for the continued presence of the vessel and its crew in this jurisdiction. The petitioners objected to these non-monetary terms of the security agreement on the ground that § 1908(e) does not authorize the Coast Guard to demand both a bond and other non-monetary surety terms, and on the ground that the terms of the proposed security agreement would acomplish the de facto detention of material witnesses for an indefinite period of time, at the petitioners' expense.[3]

The petitioners filed their emergency petition and motion on April 25, 2013. The respondents filed their response and motion to dismiss on May 2, 2013. The petitioners did not file a reply brief.

A hearing was held before the undersigned on May 6, 2013, while awaiting a jury verdict in a complex criminal case. During the hearing, the Court recessed for a period of hours to permit the parties to meet and attempt once more to reach a negotiated resolution to this matter. Party representatives for both sides were able to reach an agreement in principle on a $1.5 million bond plus certain non-monetary conditions, subject to approval by Coast Guard headquarters in Washington, D.C. But when the Court reconvened the hearing, it was advised that this settlement in principle had been rejected by the Coast Guard in Washington, D.C. The Court wanted to know who made the decision for the Coast Guard, but no one in or near the courtroom knew who it was—only that it was "the Coast Guard." At the prodding of the Court, and after some recesses, the Coast Guard officers in the courtroom and their counsel were able to identify Captain Melissa Bert, Chief of the Maritime and International Law Division, as the individual who rejected the proposed

---

[3] In e-mail correspondence with the Coast Guard, counsel for the petitioners indicated that salaries and expenses for supporting the seven crewmembers would cost approximately $60,000 per month, at a minimum. Chalos Decl. Ex. 7, at AGP 000086. This estimated expense does not include any revenue lost to the owner and operator while the Pappadakis is effectively detained and unable to generate an income by transporting goods. Nor does it include any expense suffered by the third-party recipient of the coal loaded onto the Pappadakis prior to its detention.

agreement. Counsel further advised the Court that, pursuant to Captain Bert's guidance, the Coast Guard firmly refuses to accept less than the $2.5 million bond it had previously offered. That was that, and nothing else was acceptable.

The Court heard further argument and ultimately found that it had subject matter jurisdiction and that the Coast Guard's decision to withhold departure clearance and its refusal to set a reasonable bond amount constituted an abuse of discretion and a total lack of due process. The Court advised the parties that a written opinion would follow, and the hearing was adjourned.

## II. ANALYSIS

The petitioners contend that the Coast Guard has abused its discretion in its decision to withhold departure clearance from the Pappadakis. In particular, the petitioners contend that the Coast Guard has abused its discretion by demanding an excessive bond, and by insisting that any security agreement include certain additional non-monetary conditions. The petitioner requests that this Court order the government to grant departure clearance to the Pappadakis upon posting of a reasonable surety bond with some special conditions. But before addressing the petitioner's claims, the Court must first address the threshold issue of whether it has subject matter jurisdiction to consider this dispute and order the requested relief.

### A. Subject Matter Jurisdiction

The petitioners bear the burden of proving subject matter jurisdiction. See McBurney v. Cuccinelli, 616 F.3d 393, 408 (4th Cir. 2010); see also Shipbuilders Council of Am., Inc. v. U.S. Dep't of Homeland Sec., 481 F. Supp. 2d 550, 555 (E.D. Va. 2007). The petitioners advance several alternative bases for subject matter jurisdiction. The Court finds two of these compelling and concludes that it does indeed have subject matter jurisdiction to consider this dispute and order the requested relief.

- 6 -

### 1. The Administrative Procedure Act

Under the Administrative Procedure Act ("APA"), judicial review is available for a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. In the absence of a final agency action, a federal court lacks subject matter jurisdiction under the APA. See Flue-Cured Tobacco Coop. Stabilization Corp. v. U.S. Envtl. Prot. Agency, 313 F.3d 852, 857 (4th Cir. 2002); see also Shipbuilders Council, 481 F. Supp. 2d at 555. The respondents contend that the Coast Guard's decision to withhold departure clearance is not a final action because the petitioners have failed to exhaust the applicable administrative appeals process. See 33 C.F.R. § 160.7.

The parties have reached a stalemate on the bond issue. The Coast Guard insists that the petitioner post a $2.5 million bond, and no less, as a condition for receiving departure clearance. The petitioners claim that they are financially unable to pay a cash bond or secure a surety bond in that amount, and they have proffered company financial reports and other records in support. Based on this information, the petitioners claim that they are able at most to post a $750,000 cash bond, or that they may be able to secure and post a $1.5 million surety bond. In either event, at a minimum, the parties have reached stalemate with a gulf of no less than $1 million between them, and it is clear that neither party will budge.

There is an exceedingly thin body of case law on this issue, but at least one other court has found that a "take-it-or-leave-it" bond demand by the Coast Guard constituted a final agency action sufficient to satisfy the APA's jurisdictional prerequisite. See Giuseppe Bottiglieri Shipping Co. S.p.A. v. United States, 843 F. Supp. 2d 1241, 1247 (S.D. Ala. 2012). Moreover, prior decisions by the Fourth Circuit and this Court have recognized certain enumerated exceptions to the APA's exhaustion requirement.

> Exhaustion of administrative remedies is not required if: "(1) the dispute concerns statutory construction; (2) using administrative procedures would

> cause irreparable injury; (3) resorting to administrative procedures would be
> futile; (4) administrative remedies would be inadequate; or (5) the
> administrative decision would go unreviewed."

Clear Sky Car Wash, LLC. v. City of Chesapeake, --- F. Supp. 2d ----, 2012 WL 6607142, at *15

(E.D. Va. 2012) (quoting Fares v. United States I.N.S., 50 F.3d 6, 1995 WL 115809, at *3 (4th Cir.

Mar. 20, 1995) (unpublished table decision)); see also McDonald v. Centra, Inc., 946 F.2d 1059,

1063 (4th Cir. 1991). The Court finds that all five exceptions have been met in this case by the

petitioners.

First, this dispute involves statutory construction. Section 1908(e) of APPS authorizes

issuance of a vessel's departure clearance to be conditioned upon the filing of a "bond or other

surety" satisfactory to the Coast Guard. Because this provision is written in the disjunctive, the

petitioner argues that the Coast Guard's demand that the petitioners both post bond and agree to

certain additional non-monetary terms as security for the vessel's clearance exceeds the scope of its

authority under the statute. The Coast Guard, on the other hand, erroneously contends that "or"

means "and"—that the word "or" is actually conjunctive and not disjunctive.

Second, reliance on the administrative appeals process alone would cause irreparable injury

to the owner of the Pappadakis. The respondents concede that exhaustion of the administrative

appeals process would take "a year or so," and based on his prior experience in other matters,

counsel for the petitioner has suggested that administrative appeals from Coast Guard actions

sometimes take several years to resolve. But petitioner Angelex has only one income-producing

asset, the Pappadakis, burdened by a mortgage that exceeds its present value by nearly double. In a

tough economy for shipping, the company has been surviving in recent years on a narrow margin.

With the Pappadakis idle, the vessel produces no income (counsel estimates that the vessel ordinarily

earns about $12,000 per day) and Angelex continues to expend approximately $120,000 per month

(about $4,000 per day) just to maintain the vessel's crew. With thin margins and an overwhelming

debt load, the extensive delay inherent in the Coast Guard's administrative appeals process likely would be a death knell for this company.

Reliance on the administrative appeals process would cause undue hardship not only to the owner of the Pappadakis, but to its crewmembers as well. In the absence of this Court's exercise of jurisdiction, they remain functionally detained aboard the ship, moored at a dock in Portsmouth, Virginia. Even if the petitioners were able to obtain the necessary funds to post a $2.5 million bond, under the terms of the proposed security agreement demanded by the Coast Guard, the seven crewmembers considered to be material witnesses would continue to be detained here in this district for an indefinite period of time.

Third, resorting to the administrative appeals process would be futile. As in the Giuseppe case, the Coast Guard has made it clear that $2.5 million is its firm and final bond demand. Moreover, the decision has been made not at the local level, but at Coast Guard headquarters in Washington, rendering any administrative appeal through the intermediate district and area levels of authority entirely futile. See generally 33 C.F.R. § 160.7.

Fourth, any administrative remedies would be inadequate. By the time an administrative appeal is resolved, Angelex would be out of business, its employees out of work, and its creditors, including the United States, unable to obtain full satisfaction. Even if it was able to auction the vessel and recover full appraisal value (approximately $6.5 million), the Coast Guard still would not recover any fines or civil penalties owed. After any expenses of justice during custodia legis, any seamen's wage liens, and satisfaction of the outstanding $10.65 million preferred mortgage lien on the ship, there would be nothing left to pay any fine or civil penalties assessed for violation of federal statutes. See generally United States v. One (1) 254 Ft. Freighter, M/V Andoria, 570 F. Supp. 413, 415 (E.D. La. 1983) (listing the order of priority for payment of maritime claims), aff'd,

768 F.2d 597 (5th Cir. 1985); United States v. Austal USA LLC, 815 F. Supp. 2d 948, 963 (E.D. Va. 2011) (citing Andoria with approval).

Fifth, the administrative decision will likely go unreviewed. Before any administrative appeal with respect to the withholding of departure clearance and the Coast Guard's bond demand could be resolved, the anticipated criminal proceedings underlying this action most likely will have proceeded to trial and judgment, rendering any administrative appeal moot.

Based on the foregoing, the Court finds that the "final agency action" requirement of the APA has been met. This leaves one last argument by the respondents on jurisdiction under the APA.

Relying on the Giuseppe decision, the respondents contend that, notwithstanding the existence of a "final agency action" under the APA, this Court lacks subject matter jurisdiction because § 1908(e) grants the Coast Guard "enormously broad discretion . . . to decide, in the first place, whether to grant clearance at all (hence the statement that clearance may—not 'must' or 'shall'—be granted) and, if so, on what terms (hence the allowance for bond or other surety 'satisfactory to the Secretary')." Giuseppe, 843 F. Supp. 2d at 1248; see also 5 U.S.C. § 701(a)(2) ("This chapter applies . . . except to the extent that . . . agency action is committed to agency discretion by law."). But this holding appears to be at odds with Fourth Circuit precedent, which holds to the contrary that, even if a statute confers absolute discretion upon an agency, the federal courts retain jurisdiction to review discretionary agency actions for abuse of discretion. See Elecs. of North Carolina, Inc. v. S.E. Power Admin., 774 F.2d 1262, 1267 (4th Cir. 1985) (noting that, even where an action is committed to absolute agency discretion by law, courts retain the power to review allegations that the agency exceeded its legal authority); see also Littell v. Morton, 445 F.2d 1207, 1211 (4th Cir. 1971) (court retained jurisdiction to review discretionary agency determination for abuse of discretion); Shipbuilders Council of Am., Inc. v. U.S. Dep't of Homeland Sec., 673 F.

Supp. 2d 438, 448 (E.D. Va. 2009) (court retained jurisdiction to review whether discretionary agency decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law). Thus, § 701(a)(2) does not provide a jurisdictional bar to review in this case.

Accordingly, the Court finds that it has subject matter jurisdiction under the APA.

### 3. Admiralty Jurisdiction

In the alternative, the Court also finds that this matter falls within the Court's admiralty jurisdiction. Based on the facts of record in this case, the Court finds that the withholding of departure clearance from the Pappadakis for an indefinite period, under circumstances where the bond conditions imposed by the Coast Guard are simply unattainable, for the purpose of securing payment of potential fines and civil penalties, is tantamount to an arrest of the ship. The only distinction between this functional arrest of the vessel and a proper maritime arrest is that in this case, absent the exercise of jurisdiction by this Court in the matter, the vessel and its owner have been denied any due process whatsoever. Because this matter involves a functional substitute for arrest of the vessel in rem, it falls within the Court's admiralty jurisdiction. See 28 U.S.C. § 1333; Fed. R. Civ. P. 9(h); Cargill Ferrous Int'l v. M/V Medi Trader, 513 F. Supp. 2d 609, 612 (E.D. La. 2007).

### B. Abuse of Discretion

Having established subject matter jurisdiction, the Court turns to consider whether the Coast Guard's actions constitute an abuse of discretion.

Section 1908(e) commits to the discretion of the Secretary of Homeland Security the determination of whether a "bond or other surety" offered as a condition for obtaining departure clearance is "satisfactory." 33 U.S.C. § 1908(e) ("Clearance may be granted upon the filing of a bond or other surety satisfactory to the Secretary."). She, in turn, appears to have delegated this

discretionary authority to the Coast Guard, a component agency of the Department of Homeland Security. 33 C.F.R. § 4.66c(a) ("Clearance or a permit to proceed may be granted when the port director is informed that a bond or other security satisfactory to the Coast Guard has been filed."). Although this determination is committed to agency discretion, the APA provides limited judicial review to determine whether there was an abuse of that discretion. See Littell, 445 F.2d at 1211; Shipbuilders Council, 673 F. Supp. 2d at 448.

An agency decision is an abuse of discretion if, in so deciding, the agency "exceeded its legal authority, acted unconstitutionally, or failed to follow its own regulations." Elecs. of North Carolina, 774 F.2d at 1267. An agency decision is an abuse of discretion if it is "made without a rational explanation, inexplicably departed from established policies, or rested . . . on other considerations that Congress could not have intended to make relevant." Littell, 445 F.2d at 1211 (quoting another source) (omission in original). An agency's authority "is not absolute and the agency's determinations must be reasonable." Shipbuilder's Council, 673 F. Supp. 2d at 448.

The petitioners contend that the Coast Guard has exceeded its legal authority under the express terms of § 1908(e) by insisting that the only "satisfactory" bond or other surety for the Pappadakis to obtain departure clearance is a security agreement that includes both the posting of bond and additional non-monetary conditions intended to assist the government in its criminal investigation. The petitioners contend that the word "or" in § 1908(e) is used in the disjunctive sense, authorizing the respondents to require the filing of either a bond or some other form of security, but not both. The respondents, however, contend that the word "or" is used in the conjunctive sense, permitting the respondents to require the filing of either a bond or some other form of security, or both bond and other security.

"Normally, use of a disjunctive indicates alternatives and requires they be treated separately unless such a construction renders the provision repugnant to the Act." George Hyman Constr. Co. v. Occupational Safety & Health Reviwe Comm'n, 582 F.2d 834, 840 n.10 (4th Cir. 1978). A "bond" is "[a] written promise to pay money or do some act if certain circumstances occur or a certain time elapses; a promise that is defeasible upon a condition subsequent." Black's Law Dictionary 169 (7th ed. 1999). A "surety" is "[a] formal assurance; esp., a pledge, bond, guarantee, or security given for the fulfillment of an undertaking." Id. at 1456. Thus, this statute authorizes the respondents to require the petitioners to file a written promise to pay money or do some act if certain circumstances occur or a certain time elapses, or to file some other form of formal assurance.

Based on the statutory context of this grant of discretion, it is apparent that the "bond or other surety" is intended to guarantee the government's recovery of any fine or civil penalties that might follow from a vessel's violation of the MARPOL Protocol. See generally 33 U.S.C. § 1908. This is made even clearer by reference to the legislative history of the statute:

> This section provides for the imposition of criminal and civil penalties for violations of the MARPOL Protocol, the Act, or the regulations issued thereunder. . . . It also makes a vessel that is operated in violation liable in rem. To assure payment of any fine or civil penalties that might be incurred upon completion of criminal proceedings or civil penalty actions, the Secretary of the Treasury is required to refuse or revoke clearance to any ship upon request of the Secretary of Transportation. However, clearance may be granted upon the filing of a bond or other satisfactory surety.[4]

H.R. Rep. No. 96-1224 (1980), reprinted in 1980 U.S.C.C.A.N. 4849, 4864. Thus, the statute and its implementing regulations grant the Coast Guard legal authority to condition a vessel's departure clearance on the filing of a bond or other surety for the purpose of assuring payment of any fine or

---

[4] In 2003, the duties and powers of the Secretary of the Treasury and the Secretary of Transportation under this statute were transferred to the newly established Secretary of Homeland Security, along with the transfer of supervision and control of the Customs Service and the Coast Guard from the Department of the Treasury and the Department of Transportation, respectively, to the newly formed Department of Homeland Security.

- 13 -

civil penalty that might be incurred by the vessel in rem upon the completion of criminal or civil proceedings. The Coast Guard is granted discretion to determine what amount or form of bond or other surety is satisfactory. To the extent that the Coast Guard seeks to impose any additional conditions or terms not related to securing the ultimate payment of any fines or civil penalties that might follow, it has exceeded its legal authority under the statute.

In this case, the Coast Guard seeks to impose several conditions designed not to assure payment of any fines or civil penalties, but to facilitate the prosecution of criminal or civil proceedings against the petitioners. In so doing, the Coast Guard has exceeded its legal authority and abused its discretion.

Moreover, in refusing to set a reasonable bond amount, insisting that no less than a $2.5 million bond is "satisfactory" to assure the payment of potential fines and civil penalties in this case, the Coast Guard has also abused its discretion. As against the vessel, in rem, the statutory maximum fine in the anticipated criminal proceedings underlying this action is $1.5 million—$500,000 for each of three United States port calls. In the similar cases discussed at length in the parties briefs (Giuseppe, Nimmrich, Wilmina, and Lantra), the ultimate fine imposed was no more than $1 million in any one of these cases. In a footnote to the respondents' brief, they set forth a list of criminal fines imposed in several cases involving similar circumstances, ranging from $1 million to $37 million, but the facts pertaining to these cases are not detailed.[5] Disregarding the outliers involving additional offenses, multiple vessels, or egregious conduct not alleged to have occurred in this

---

[5] Upon cursory review of court records for these cases, the convictions resulting in fines in excess of $1.5 million appear to involve additional offenses, multiple vessels, or egregious conduct not alleged to have occurred in this matter. For example, the Overseas Shipholding Group fine of $37 million was imposed in connection with a multi-jurisdiction proceeding involving no fewer than forty counts against the defendant shipowner.

matter, based on perusal of this list, it appears appropriate to characterize a fine of $1.5 million as a typical fine for the criminal conduct alleged in this case.

More significant, however, in the Court's consideration, is the financial condition of the vessel owner. The record before the Court includes persuasive evidence that a $2.5 million bond— or fine for that matter—is simply beyond the financial wherewithal of the petitioners, and that the continued detention of the vessel by withholding its departure clearance will rapidly bankrupt the vessel's owner. Indeed, it is useful to recall that the bond amount required to secure a vessel's departure clearance is intended to assure payment of any fines or civil penalties that might be imposed as a result of the vessel's violation of the MARPOL Protocol. But, under the sentencing guidelines, any fine that might be imposed upon conviction in the anticipated criminal proceedings would be limited so as to avoid "substantially jeopardizing the continued viability of the organization." U.S.S.G. § 8C3.3(b). Indeed, a court's imposition of a fine so substantial that it wiped out a business organization would itself be an abuse of discretion. See Standard Oil Co. of Indiana v. United States, 164 F. 376, 386–89 (7th Cir. 1908) ("[T]his is not the punishment of an unlawful business, but the punishment of unlawful practices connected with a lawful business . . . ."). The idea that by imposition of an unreasonable bond demand, the Coast Guard might accomplish what it cannot do through prosecution of the underlying criminal offense—the extinguishment of a lawful business, to the detriment of its principals, its employees, its creditors, and its customers, but to the advantage of no one—without due process is simply repugnant to the Constitution. In more than thirty years on the bench, this Court can recall seeing no greater disregard for due process, nor any more egregious abdication of the reasonable exercise of discretion.

Accordingly, the Court finds that the Coast Guard's demand for a $2.5 million bond as a condition for granting departure clearance to the Pappadakis was unreasonable, arbitrary, and capricious, and its attempt to impose additional non-monetary conditions unrelated to assuring payment of any fines or civil penalties exceeds its legal authority under § 1908(e). Moreover, having found that this matter falls within the Court's admiralty jurisdiction, the Court further finds that the petitioners have an absolute right to release of the vessel upon posting of adequate security. See Gerard Constr., Inc. v. M/V Virginia, 480 F. Supp. 488, 491 (W.D. Pa. 1979); Fed. R. Civ. P. Supp. E(5).

## III. CONCLUSION

For the foregoing reasons, the Court finds that it has subject matter jurisdiction, that the Coast Guard abused its discretion in demanding a $2.5 million bond as a condition for granting departure clearance to the Pappadakis and in demanding the imposition of additional non-monetary conditions unrelated to assuring payment of any fines or civil penalties, and that the petitioners have an absolute right to release of the vessel upon posting of adequate security.

The Court will enter a separate order and injunction directing that Pappadakis be released and granted departure clearance upon the filing of a $1.5 millon penal bond with conditions. The Court will retain jurisdiction to ensure compliance with all orders of the Court.

**IT IS SO ORDERED.**

May 8 , 2013
Norfolk, Virginia

**Robert G. Doumar**
**Senior United States District Judge**